UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X
                                                                 :
MB, individually and on behalf of RAB,                           :
                                                                 :
                                        Plaintiffs,              :
                                                                 :
                              -v-                                :
                                                                 :
CITY SCHOOL DISTRICT OF NEW                                      :
ROCHELLE,                                                        :
                                                                 :
                                        Defendant.               :
                                                                 :
-----------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 29, 2018

17-cv-1273 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

MB commenced this action, individually and on behalf of her minor child RAB (collectively, "plaintiffs"), pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq. Plaintiffs seek review of a November 23, 2016 decision by a State Review Officer ("SRO") concluding that the City School District of New Rochelle ("defendant" or the "School District") provided RAB with a free appropriate public education ("FAPE") for the 2013-14, 2014-15, and 2015-16 school years.

Plaintiffs moved for summary judgment on July 26, 2017. (ECF No. 11.) As the Second Circuit has noted, a motion for summary judgment in an IDEA case is "in substance an appeal from an administrative determination, not a summary judgment [motion]." M.H. v. N.Y.C. Dep't of Educ., 685 F.3d 217, 226 (2d Cir. 2012) (internal quotation omitted). Defendant filed its opposition on October 12, 2017 (ECF No. 19), and plaintiffs replied on October 27, 2017 (ECF No. 21).

Having carefully reviewed the parties' respective briefs, the administrative record, and the decisions of both the SRO and the Independent Hearing Officer ("IHO"), the Court concludes by a preponderance of the evidence that the School District did in fact provide RAB with a FAPE for all three years at issue. Accordingly, for the reasons set forth below, the Court DENIES plaintiffs' motion for summary judgment.

## I.   BACKGROUND

The following recitation of facts is derived from the parties' respective submissions under Local Civ. R. 56.1 (ECF Nos. 13, 20), as well as certain documents in the administrative record.  The facts are undisputed unless otherwise noted.

### A.   RAB's Educational Background

RAB is a minor child with several diagnosed medical conditions, including hydrocephalus, macrocephaly, epilepsy, cerebral palsy, and spastic dysplasia.  As a result of those conditions, the School District has classified RAB as a "child with a disability" under the IDEA, 20 U.S.C. § 1401(3)(A), and has provided him with special education services since kindergarten.

From 2008–2013, RAB attended Columbus Elementary School ("Columbus"), where he was enrolled in an 8:1+2 class[1] that employed, in part, Applied Behavior

---

[1] This method of describing a classroom staffing ratio is common in the IDEA context, and is used throughout this Opinion & Order.  The first number refers to the number of students in the class, the second refers to the number of special education teachers, and the third refers to the number of paraprofessionals or "aides."  When only two numbers are used (e.g., "1:1"), the first number refers to the number of students and the second refers to the number of adults (teachers or aides).

Analysis ("ABA") methodology. In the special education context, ABA involves using "direct observation, measurement, and functional analysis of the relationship between environment and behavior" to design "environmental modifications, using behavioral stimuli and consequences" that are intended "to produce socially significant improvement[s]" in a child's behavior. <u>See</u> N.Y. Educ. Law § 8801.

In the fall of 2013, RAB was scheduled to transition from Columbus to Isaac E. Young Middle School ("IEYMS"). Accordingly, the School District conducted a series of re-evaluations to assist in preparing a new Individualized Education Program ("IEP"), including: (1) a psychological re-evaluation; (2) a physical therapy annual review; (3) an occupational therapy annual review; (4) a speech and language evaluation; (5) an educational evaluation; (6) a social history update; and (7) a medical history update.

B.    <u>School Years at Issue</u>

This action principally concerns the adequacy of RAB's IEP for the 2013-14, 2014-15, and 2015-16 school years. What follows is a brief summary of the process and substance underlying each disputed IEP.

1.    2013-14

On May 6, 2013, a subcommittee of the School District's Committee on Special Education ("CSE") convened to review RAB's new evaluations and to design an IEP for the 2013-14 school year (the "2013-14 IEP Meeting"). In attendance were MB, the School District's Assistant Director for Special Education (Laurette Shrage, who served as chairperson), a school psychologist, a speech/language

pathologist, a general education teacher, two school nurses, RAB's 2012-13 special education teacher, and an IEYMS special education teacher.

During the 2013-14 IEP Meeting, MB expressed concern that RAB was not making academic progress, and that his "current program [was] not making a difference." (See Ex. P-B at 1.)[2]  In his educational evaluation, RAB's special education teacher reported that RAB had "made progress in communication skills, social skills, behavior skills, and in Living Skills," but had "continued to show poor gains academically," particularly "in the areas of reading and mathematics."  (Id. at 3, 6.)  RAB's teacher also noted that RAB's parents had "shared their concerns relative to his poor progress throughout the past school year."  (Id. at 3.)  The subcommittee discussed multiple potential programs (including classes with eight and twelve students, respectively), and ultimately recommended placement in "Special Class 12:1:1," partially because students in that class were more social, more engaged in instruction, and able to follow more of the common core curriculum.  (Id. at 2.)

As a result of the 2013-14 IEP Meeting, the CSE subcommittee created a comprehensive IEP for the 2013-14 school year (the "2013-14 IEP").  The 2013-14 IEP called for a suite of special educational services, including: (1) placement in "Special Class (ABA Classes) 12:1+1"[3]; (2) adapted physical education; (3) bilingual

---

[2] All references to "Ex. P" followed by a letter (e.g., "Ex. P-B") refer to exhibits introduced by MB during the SRO proceedings.

[3] The 2013-14, 2014-15, and 2015-16 IEPs clearly refer to RAB's recommended placement as having a "12:1+1" staffing ratio.  Despite this, defendant consistently refers to RAB's class as having a "12:1+2" staffing ratio, and the SRO repeatedly referred to RAB's recommended placement as 12:1+2.  Further, defendant notes in passing that the ratio in practice was "usually 12:1:4 or 12:1:5." (See Def.'s Opp'n at 12 n. 8.)  That said, these discrepancies do not affect the Court's analysis for the

4

speech therapy; (4) occupational therapy; (5) physical therapy; (6) a home based program of individual therapy; and (7) a shared aide for two hours per day; (8) extended school year ("ESY") services at Barnard Elementary School; and (9) door-to-door transportation with a matron. (Id. at 18-19.) The IEP also included sixteen annual goals, each of which had "short-term instructional objectives and/or benchmarks." The 2013-14 IEP was not translated into Spanish.

RAB subsequently attended the recommended ESY services, and in September 2013 he enrolled in the recommended 12:1+1 life skills class at IEYMS. RAB did not, however, receive door-to-door transportation as called for in the 2013-14 IEP. Defendant concedes that RAB was forced to walk somewhere between one-half to one block from his home to receive transportation, purportedly because the bus was unable to turn around in RAB's cul-de-sac.

Plaintiffs allege that during the 2013-14 school year, RAB had several seizures, at least one of which went unnoticed by school staff. (Pls.' 56.1 Statement ¶ 53-54, ECF No. 13.) Plaintiffs further allege that RAB suffered physical injuries at school, and that RAB was unaccompanied by an adult "on more than 30 occasions" when MB visited IEYMS. (Id. ¶ 55, 57.) Defendant concedes that RAB suffered several seizures over the course of the year, but denies that any went unnoticed. (Def.'s 56.1 Opp'n ¶ 53-54, ECF No. 20.) Defendant further denies that RAB was "physically injured" at school, and has argued that RAB was "supervised at arm's length by an adult" at all times. (Id. ¶ 55, 57.)

reasons stated infra. The Court will refer to RAB's IEYMS placement as "12:1+1" for purposes of this Opinion & Order.

### 2. 2014-15

On June 4, 2014, a subcommittee of the CSE convened to design RAB's 2014-15 IEP (the "2014-15 IEP Meeting"). In attendance were M.B., a school psychologist (Karina Villalona), RAB's 2013-14 special education teacher (Judy Rozanski), a Spanish interpreter, and RAB's Medicaid Service Coordinator.

During the 2014-15 IEP Meeting, MB reiterated her concern with RAB's "lack of academic progress." (See Ex. P-C at 1.) She also told the subcommittee that she felt RAB had "regressed in regards to his independent living skills." (Id.) RAB's teacher reported that she was concerned about RAB's "ability to progress academically without 1:1 supervision." (Id. at 2.) For those reasons, and due to RAB's specific health concerns (including epilepsy), MB requested a full-time 1:1 aide for the 2014-15 school year. (Id.) The subcommittee considered MB's request, but ultimately recommended that RAB remain in the same 12:1+1 special life skills class he was enrolled in the prior year.

As a result of the 2014-15 IEP Meeting, the CSE subcommittee created a comprehensive IEP for the 2014-15 school year (the "2014-15 IEP"). The 2014-15 IEP called for a suite of special educational services, including: (1) placement in "Special Class 12:1+1"[4]; (2) adapted physical education; (3) bilingual speech therapy; (4) occupational therapy; (5) physical therapy; (6) a home based program of individual therapy; and (7) a shared aide as needed on a daily basis (an increase

---

[4] Defendant has asserted that omission of the parenthetical descriptor "ABA Classes" from the 2014-15 and 2015-16 recommended class placement was a "clerical decision," and that the 12:1:1 class recommended in 2014-15 and 2015-16 was the same class RAB attended during the 2013-14 school year. (See, e.g., Def.'s 56.1 Opp'n ¶ 71.)

from two hours per day in the 2013-14 IEP); (8) assistive technology including an iPad and access to Kurzweil (assistive learning software) during the school day; (9) an assistive technology consultation every two weeks; (10) ESY services at New Rochelle High School; and (11) door-to-door transportation with a matron. (Id. at 12-15.) The IEP also included thirteen annual goals (down from sixteen the previous year), each of which had "short-term instructional objectives and/or benchmarks." The 2014-15 IEP was not translated into Spanish.

During the summer of 2014, MB's mother fell ill and RAB was forced to spend significant time out of state. As a result, RAB was unable to attend the recommended ESY services provided for in the 2014-15 IEP. By September 2014, however, RAB had returned and began attending the recommended 12:1+1 life skills class—the same class he had been in the previous year. It is undisputed that for the second consecutive year, RAB did not receive door-to-door transportation as recommended.

Plaintiffs allege that during the 2014-15 school year, RAB suffered unnoticed seizures and frequent bathroom accidents. (Pls.' 56.1 Statement ¶ 83.) Plaintiffs further allege that RAB was not always supervised by an adult while at school. (Id. ¶ 82.) Defendants deny that RAB suffered unnoticed seizures, and claim that RAB's "toileting and sanitary needs were attended to." (Def.'s 56.1 Opp'n ¶ 83.) Defendants further deny that RAB was unsupervised, and argue that an adult was always within arm's length of RAB. (Id. ¶ 82.)

On January 16, 2015, MB sent a letter to the School District indicating that she had "serious concerns regarding [RAB's] current and future education" at IEYMS, and requesting an emergency CSE meeting. In response, on January 29, 2015, the School District sent MB a prior written notice ("PWN") proposing a series of re-evaluations, including a social history update, a psychological assessment, an educational evaluation, and a classroom observation. On February 23, 2015, RAB's special education teacher completed an educational evaluation report stating that RAB "requires a great deal of supervision to stay on task" and "works best in a small group environment with one to one instruction whenever possible."

On March 4, 2015, a subcommittee of the CSE held a meeting to review RAB's 2014-15 IEP and to address MB's concerns (the "March 2015 IEP Review Meeting"). In attendance were MB, her friend, her Medicaid Service Provider, the Chairperson of the CSE, a psychologist, the School District's Medical Director, a guidance counselor, the school psychologist, RAB's special education teacher, a general education teacher, and a Spanish-language interpreter. During the March 2015 IEP Review Meeting, MB expressed concern about RAB's safety, bathroom accidents, injuries, transportation, and alleged need for a 1:1 aide. The subcommittee considered MB's concerns and agreed to reconvene with more information at a later date.

On April 8, 2015, the CSE subcommittee reconvened the March 2015 IEP Review Meeting (the "April 2015 IEP Review Continuation").[5]  During the April 2015 IEP Review Continuation, MB reiterated her request for a full-time, dedicated 1:1 aide.  The subcommittee considered that request (and others related to safety and transportation), reviewed RAB's most recent evaluations, and discussed a Safety Plan for RAB.  MB requested that the name of RAB's designated safety aide be listed on the Safety Plan, but the School District declined, stating that several aides were assigned to work with RAB, and that "the district cannot guarantee that one specific individual" would always be with RAB.  (See Ex. P-D at 2.)

Ultimately, the subcommittee issued a new IEP (the "April 2015 IEP") that recommended RAB remain in the same 12:1+1 life skills class that he was currently enrolled in.  (See id. at 1.)  In fact, the April 2015 IEP did not contain any material changes to RAB's recommended educational services, and did not modify any of the goals or objectives from the 2014-15 IEP.  The April 2015 IEP was not translated into Spanish.

On April 22, 2015, MB met with Jeffrey Cole, the School District's Assistant Director of Special Education.  At that meeting, MB once again requested a full time 1:1 aide for RAB.  Following the meeting, the School District sent a letter to MB indicating that RAB "has an assigned aide" and that "[t]he assigned aide is for the entire school day."

---

[5] The attendance at this meeting was substantially the same as the March 2015 IEP Review Meeting, with the apparent exception of MB's friend, her Medicaid Service Provider, and the guidance counselor.

### 3. 2015-16

On May 27, 2015, MB sent the School District the results of a private neurodevelopmental and developmental evaluation she obtained in 2013 from the Children's Evaluation and Rehabilitation Center ("CERC").[6]  The neurodevelopmental evaluation recommended an Autism Diagnostic Observation Schedule ("ADOS") to determine if RAB had autism, and recommended consideration of a 1:1 aide for RAB "since he does better in 1-to-1."  The developmental evaluation conducted an ADOS as recommended, and determined that RAB met the criteria for a diagnosis of autism.

A subcommittee of the CSE convened to design RAB's 2015-16 IEP on two separate dates in the spring of 2015—May 29 and June 18 (collectively, the "2015-16 IEP Meetings").[7]  In attendance on the first date were M.B., the Assistant Director of Special Education (Jeffrey Cole), RAB's special education teacher (Judy Rozanski), a general education teacher, the Chairperson of the CSE, the School District's Medical Director, an advocate, and a Spanish-language interpreter (by phone).  In attendance on the second date were MB, her friend, Jeffrey Cole, Judy Rozanski, a general education teacher, and advocate, a speech language pathologist, and a Spanish-language interpreter.

---

[6] Although the evaluations were apparently conducted in 2013, the record evidence is that MB did not submit their results to the School District until May 2015.

[7] The subcommittee initially met on May 29, 2015 for a "program review."  Defendant claims (and plaintiffs have not contradicted) that the meeting was adjourned until June 18, 2015 "so that the CSE could review the reports of MB's private evaluators and create a program for the 2015-2016 school year."

During the 2015-16 IEP Meetings, MB once again requested a 1:1 aide for RAB as well as an "out of School District program." The subcommittee considered those requests, but ultimately recommended that RAB be placed in the same 12:1+1 life skills class that he had been enrolled in the previous two years. The subcommittee additionally recommended, however, that RAB receive full-time shared aide services for the entire school day.

As a result of the 2015-16 IEP Meetings, the CSE subcommittee created a comprehensive IEP for the 2015-16 school year (the "2015-16 IEP"). (See generally Ex. P-E.) The 2015-16 IEP called for a suite of special education services, including, inter alia: (1) placement in "Special Class 12:1+1"; (2) adapted physical education; (3) bilingual speech therapy; (4) occupational therapy; (5) physical therapy; (6) a home based program of individual therapy; and (7) a shared aide "[t]hroughout the School Day" (an apparent increase from the "as needed" aide recommended in the 2014-15 IEP); (8) access to water throughout the school day; (9) a safety plan; (10) assistive technology including an iPad and access to Kurzweil during the school day; (11) an assistive technology consultation every two weeks; (12) ESY services at New Rochelle High School; and (11) door-to-door transportation with a matron in an air conditioned vehicle . (Id. at 12-15.) The IEP also included fourteen annual goals (up from thirteen the previous year), each of which had "short-term instructional objectives and/or benchmarks." The 2015-16 IEP was not translated into Spanish.

C.    IHO Proceedings and Decision

On July 1, 2015, MB filed a complaint alleging the School District deprived RAB of a FAPE for the 2013-14, 2014-15, and 2015-16 school years.  As relief, MB requested a number of accommodations including, inter alia: (1) a dedicated 1:1 aide for RAB's safety and academic needs; (2) increased home-based academic services; (3) parent training and counseling; (4) adequate door-to-door transportation for RAB; and (5) a significant amount of compensatory education.  After the complaint was filed, the School District arranged for a private car to provide door-to-door transportation for RAB.  It is undisputed that RAB has received door-to-door transportation to school since approximately October 2015.

Over the course of fourteen hearing dates from November 30, 2015 to May 20, 2016, IHO Martin Schiff reviewed submitted evidence and heard live testimony related to MB's complaint.  On August 14, 2016, the IHO issued a decision concluding, in sum and substance, that the School District had provided a FAPE in 2013-14 and 2014-15, but had failed to provide a FAPE in 2015-16.  (See generally Hearing Officer's Finding of Fact and Decision ("IHO Dec."), ECF No. 14-1.)  The IHO's decision with regards to 2015-16 was based in large part on the fact that the School District had failed to adequately consider the private CERC evaluation submitted by MB in May 2015 that concluded RAB was likely autistic.  (See id. at 26-27.)  The IHO specifically faulted the CSE subcommittee for issuing an IEP that was "largely the same as that of the previous year" with "no change or program or placement to reflect the confirmation" of an autism diagnosis.  (Id. at 26.)

Although the IHO concluded that the School District failed to provide a FAPE for the 2015-16 school years, he did not order any compensatory education or require a 1:1 aide as requested. Instead, the IHO directed the School District to "authorize and conduct an Independent Educational Evaluation (IEE) expeditiously for the 2016-17 school year to consider the autism condition along with the child's existing conditions" and "re-convene [the CSE subcommittee] to consider the results of the IEE for a new IEP." (Id. at 29-30.) The IHO further ordered that the new IEP contain "at least 4 hours monthly of parent counseling and training." (Id. at 30.)

    D.    SRO Proceedings and Decision

On September 19, 2016, MB appealed the IHO's decision that the School District provided a FAPE for the 2013-14 and 2014-15 school years. On October 11, 2016, the School District cross-appealed the IHO's decision that it had failed to provide a FAPE for the 2015-16 school year. On November 23, 2016, SRO Sarah L. Harrington granted the School District's appeal and denied MB's. (See generally Decision ("SRO Dec."), ECF No. 14-2. In sum, the SRO concluded that the School District had provided RAB with a legally sufficient FAPE for all three years in question.

Below is a brief summary of the SRO's relevant conclusions[8]:

- Transportation: All of MB's transportation-related complaints (i.e., that RAB was denied door-to-door transportation as recommended in the IEPs) were moot because RAB began receiving door-to-door transportation in October 2015. The SRO noted that even if there was a violation during

---

[8] As a technical matter, at points the SRO was merely affirming the IHO's conclusions, or holding that there was "no basis to overturn" such conclusions.

the 2013-14 and 2014-15 school years, MB had not requested any relief for that violation.  (See id. at 12.)

- Translation and Interpretation:  Because the record demonstrated that MB participated meaningfully in all relevant meetings and received translated summaries of all relevant evaluations, there was no basis for relief based on the School District's alleged failure to provide certain documents in Spanish or provide translation services at certain meetings.  (See id. at 12-14.)

- 2013-14 School Year:  The CSE subcommittee considered adequate evaluative information and "thoroughly identified [RAB's] skills and needs in cognitive, academic, communication, motor, and social/behavioral domains."  (Id. at 14-21.)  Additionally, the "annual goals and short-term objectives" contained in the 2013-14 IEP "comported with the present levels of performance and appropriately addressed the student's identified needs."  (Id. at 21-22.)  Further, the 2013-14 IEP did not deprive RAB of a FAPE by: (1) not recommending assistive technology; (2) recommending placement in a 12:1+2 class with shared aide services; (3) failing to recommend a dedicated 1:1 aide; or (4) allegedly failing to provide appropriate speech-language services.  (Id. at 22-27.)  Finally, the School District did not fail to implement the 2013-14 IEP in a way that deprived RAB of a FAPE.  (Id. at 28-30.)

- 2014-15 School Year:  The CSE subcommittee considered "timely and sufficient evaluative information" related to RAB's academic skills, social/emotional abilities, gross and fine motor skills, and speech-language skills, and there was no indication that RAB's language or social skills required further assessment.  (Id. at 31-32.)  Additionally, the "annual goals and short-term objectives contained in the [2014-15 IEP] appropriately addressed [RAB's] identified needs."  (Id. at 32-33.)  Further, the 2014-15 IEP did not deprive RAB of a FAPE by: (1) recommending placement in a 12:1+2 class with shared aide services; (2) failing to recommend a dedicated 1:1 aide (though the IEP should have included a more robust seizure management plan); (3) allegedly failing to provide ABA instruction; or (4) allegedly failing to provide appropriate speech-language services.  (Id. at 33-37.)  Finally, the School District did not fail to implement the 2014-15 IEP in a way that deprived RAB of a FAPE.  (Id. at 37-38.)

- 2015-16 School Year:  The private evaluations submitted by MB were "generally consistent" with evaluative information the CSE subcommittee already had regarding RAB, "therefore the district was not required to conduct its own 'up-to-date evaluation for autism' to offer [RAB] a FAPE."

(Id. at 38.)  Indeed, the CSE subcommittee had "timely and sufficient evaluative information regarding [RAB's] then-current skills and needs . . . which was incorporated into the [2015-16 IEP]."  (Id. at 38-42.)  Additionally, the "annual goals and short-term objectives contained in the [2015-16 IEP] appropriately addressed [RAB's] identified needs."  (Id. at 42-43.)  Further, the 2015-16 IEP did not deprive RAB of a FAPE by: (1) recommending placement in a 12:1+2 class with shared aide services; (2) failing to recommend a dedicated 1:1 aide; (3) allegedly failing to provide for RAB's safety needs; (4) allegedly failing to provide ABA instruction; or (5) allegedly failing to provide appropriate speech-language services.  (Id. at 43-46.)

As a result of the SRO's decision, the School District was not required to conduct an IEE or re-convene the CSE subcommittee as directed by the IHO.

E.     Proceedings in this Court

On February 20, 2017, plaintiffs filed a complaint in this Court challenging the IHO and SRO decisions.[9]  (See generally Compl., ECF No. 1.)  Plaintiffs seek an order reversing the SRO decision in full, and modifying the IHO decision to conclude that the School District failed to provide a FAPE in 2013-14 and 2014-15 (in addition to 2015-16.)  Plaintiffs also seek costs and fees for both the underlying administrative proceedings and this action pursuant to 20 U.S.C. § 1415.  Following an in-person conference with Judge Vincent L. Briccetti, plaintiffs moved for summary judgment on July 26, 2017.  (ECF No. 11.)  Defendant opposed that motion on October 12, 2017 (ECF No. 19), and plaintiffs replied on October 27, 2017 (ECF No. 21).

---

[9] This action was originally assigned to Judge Vincent L. Briccetti.  It was transferred to the undersigned for all purposes on September 26, 2017.

II.     LEGAL PRINCIPLES

A.      Statutory Background

The IDEA requires states receiving federal funds to provide all in-state children with disabilities a FAPE "that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A); see also 20 U.S.C. § 1412(a)(1)(A) (providing that a FAPE must be made available to "all children with disabilities residing in the State between the ages of 3 and 21").  A FAPE must include "special education and related services tailored to meet the unique needs of a particular child" and must be "reasonably calculated to enable the child to receive educational benefits."  Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 107 (2d Cir. 2007) (quoting Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998)).

The special education and related services required for a FAPE must be administered pursuant to an IEP, which the relevant school district must develop, review, and revise annually.  See 20 U.S.C. § 1414(d).  The IEP must include, inter alia: (1) "a statement of the child's present levels of academic achievement and functional performance"; (2) "a statement of measurable annual goals, including academic and functional goals"; (3) "a description of how the child's progress toward meeting the annual goals . . . will be measured and when periodic reports . . . will be provided"; (4) "a statement of the special education and related services and supplementary aids and services . . . to be provided to the child."  Id.; see also Honig

v. Doe, 484 U.S. 305, 311 (1988) (noting that an IEP "sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives."); M.H., 685 F.3d at 245. In New York, CSEs are responsible for creating a student's IEP. The CSE must include the student's parents, a regular or special education teacher, a school board representative, and others. See N.Y. Educ. Law § 4402(1)(b)(1)(a).

"Two issues are relevant to a federal court's review of a challenged IEP: (1) whether the state complied with the procedural requirements of IDEA, and (2) whether the challenged IEP was 'reasonably calculated to enable the child to receive educational benefits.'" Walczak, 142 F.3d at 129 (quoting Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 206-07 (1982)). Accordingly, this Court must address both the procedural and substantive adequacy of the disputed IEPs. If the IEP is both procedurally and substantively adequate, "the State has complied with the obligations imposed by Congress and the courts can require no more." Rowley, 458 U.S. at 207.

B.     Procedural Adequacy

As the Second Circuit has noted, "[t]he initial procedural inquiry is no mere formality." Walczak, 142 F.3d at 129. Indeed, the Supreme Court has held that "adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." Rowley, 458 U.S. at 206. The primary inquiry in assessing the procedural

adequacy of an IEP is "whether the [parent(s)] had an adequate opportunity to participate in the development of [the] IEP." Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 (2d Cir. 2005); see also 20 U.S.C. § 1415(b)(1) (providing, in relevant part, that parents must have "[a]n opportunity . . . to examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child.").

The IDEA also requires that the relevant local agency provide "[w]ritten prior notice to the parents of the child" whenever the agency "(A) proposes to initiate or change; or (B) refuses to initiate or change, the identification, evaluation, or educational placement of the child, or the provision of a [FAPE[ to the child." 20 U.S.C. § 1415(b)(3); see also 20 U.S.C. § 1415(c)(1) (setting out the required content for the prior written notice). Such notice must be provided "in the native language of the parents, unless it clearly is not feasible to do so." 20 U.S.C. § 1415(b)(4).

Importantly, "not every procedural error will render an IEP legally inadequate." See M.H., 685 F.3d at 245 (citing Grim v. Rhinebeck Central Sch. Dist., 346 F.3d 377, 381 (2d Cir. 2003)). Rather, relief is warranted only if the alleged procedural inadequacies "(I) impeded the child's right to a [FAPE]; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of [a FAPE] to the parents' child; or (III) caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii). However, "multiple procedural violations may cumulatively result in the denial of a FAPE

even if the violations considered individually do not." M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ., 725 F.3d 131, 139 (2d Cir. 2013) (internal alteration omitted).

C. Substantive Adequacy

"[A] school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement." T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 254 (2d Cir. 2009) (quoting Cerra, 427 F.3d at 195); see also Rowley, 458 U.S. at 201 (holding that the IDEA provides only for a "basic floor of opportunity . . . consist[ing] of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child."). In 2017, the Supreme Court clarified that a disabled child's educational program "must be appropriately ambitious in light of his circumstances," and must provide for more than just de minimis progress from year to year. See Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, 137 S. Ct. 988, 1000-01 (2017).

All that being said, it is well established that school districts are "not required to 'furnish[] every special service necessary to maximize each handicapped child's potential.'" T.P., 554 F.3d at 254 (quoting Rowley, 458 U.S. at 199). Put another way, the IDEA only guarantees "an appropriate education, not one that provides everything that might be thought desirable by loving parents." Walczak, 142 F.3d at 132 (internal quotation marks omitted); see also Endrew F., 137 S. Ct. at 999 ("Any review of an IEP must appreciate that the question is whether the IEP

is <u>reasonable</u>, not whether the court regards it as ideal.") (emphasis in original) (citation omitted).

D.    <u>Standard of Review</u>

As previously noted, a motion for summary judgment in an IDEA case is "in substance an appeal from an administrative determination, not a summary judgment [motion]." <u>M.H.</u>, 685 F.3d at 226 (internal quotation omitted). The motion "serves as a pragmatic procedural mechanism for reviewing a state's compliance with the procedures set forth in [the] IDEA [in developing the specific IEP at issue] and determining whether the challenged IEP is reasonably calculated to enable the child to receive educational benefits." <u>Id.</u> at 225-226 (quoting <u>Lillbask ex. rel. Mauclaire v. State of Conn. Dep't of Educ.</u>, 397 F.3d 77, 83 n.3 (2d Cir. 2005) (internal quotation marks omitted)).

"In considering an IDEA claim, a district court must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence." <u>C.L. v. Scarsdale Union Free Sch. Dist.</u>, 744 F.3d 826, 837-38 (2d Cir. 2014) (internal quotation omitted); <u>see also</u> 20 U.S.C. § 1415(i)(2)(C)(iii). That said, the required "independent" review "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." <u>Rowley</u>, 458 U.S. at 206. Federal courts must not "simply rubber stamp administrative decisions," but "are expected to give 'due weight' to these proceedings, mindful that the judiciary generally 'lack[s] the specialized knowledge and experience necessary to resolve

persistent and difficult questions of educational policy.'" <u>Walczak</u>, 142 F.3d at 129

(quoting <u>Rowley</u>, 458 U.S. at 206, 208).

As a result, it has been established that "the role of the federal courts in

reviewing state educational decisions under the IDEA is 'circumscribed.'"

<u>Gagliardo</u>, 489 F.3d at 112 (quoting <u>Muller v. Comm. On Special Educ.</u>, 145 F.3d 95,

101 (2d Cir. 1998)); <u>see also</u> <u>Grim</u>, 346 F.3d at 380-381 (nothing that "[t]he Supreme

Court and [Second Circuit] have interpreted the IDEA as strictly limiting judicial

review of state administrative decisions.").  Indeed, "it is critical to recall that

IDEA's statutory scheme requires substantial deference to state administrative

bodies on matters of educational policy," <u>Cerra</u>, 427 F.3d at 191, and that "[t]he

responsibility for determining whether a challenged IEP will provide a child with [a

FAPE] rests in the first instance with administrative hearing and review officers,"

<u>Walczak</u>, 142 F.3d at 129.

The resulting standard of review "requires a more critical appraisal of the

agency determination than clear-error review," but "falls well short of complete <u>de</u>

<u>novo</u> review."  <u>M.H.</u>, 685 F.3d at 244 (internal quotation omitted).  As the Second

Circuit has explained:

> [T]he district court's analysis will hinge on the kinds of considerations that
> normally determine whether any particular judgment is persuasive, for
> example whether the decision being reviewed is well-reasoned, and whether
> it was based on substantially greater familiarity with the evidence and the
> witnesses than the reviewing court.  But the district court's determination of
> the persuasiveness of an administrative finding must also be colored by an
> acute awareness of institutional competence and role.

Id. "By way of illustration, determinations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures," and "[d]eterminations grounded in thorough and logical reasoning should be provided more deference than decisions that are not." Id. (citation omitted); see also R. E. v. N.Y.C. Dept. of Educ., 694 F.3d 167, 189 (2d Cir. 2012) (holding that "the deference owed to an SRO's decision depends on the quality of that opinion").

When, as here, an IHO and SRO reach conflicting conclusions, the court must generally "defer to the final decision of the state authorities, that is, the SRO's decision." R.E., 694 F.3d at 189.

III.    DISCUSSION

As an initial matter, it is clear that MB cares deeply for her son. She has strong opinions regarding the type of education he should receive, and has been a determined advocate for him throughout the lengthy administrative process and now three levels of review. No part of this Court's opinion is meant to undermine or disparage MB's efforts to ensure the School District is complying with its legal obligations, or to ensure the best possible education for RAB.

That being said, the administrative record in this case makes clear that the School District also cares genuinely about RAB's educational advancement. To wit, the School District has worked diligently to develop and implement three comprehensive and thoughtful IEPs that are designed "to produce progress, not regression," and "afford[] the student with an opportunity greater than mere trivial

advancement." T.P., 554 F.3d at 254.  Although the IEPs at issue do not

recommend the precise collection of special education and related services that MB

would prefer, they nonetheless provide RAB a free appropriate public education

under the law.

Having carefully reviewed the parties' respective briefs and the underlying

administrative record, the Court agrees with the SRO's determination that the

School District provided RAB with a FAPE for all three school years at issue in this

action.  The Court's analysis is broken down into consideration of plaintiffs'

procedural and substantive arguments, respectively.

A.    Procedural Adequacy

Plaintiffs' procedural arguments are broken into three groups for purposes of

this Opinion & Order: (1) defendant's alleged failure to provide adequate language

support for MB (See Pls.' Mem. of Law in Supp. of Mot. for Summ. J. (Pls.' Mem.) at

4-8, ECF No. 12); (2) defendant's alleged failure to properly evaluate RAB (id. at 8-

10); and (3) "other procedural violations," including failure to provide parent

counseling (id. at 11-12).  Each group will be addressed in turn.

1.    Parent Participation

The IDEA and its associated regulations (both federal and state) make clear

that local agencies should, whenever feasible, provide translations of important

documents and interpretation services for relevant meetings.  See, e.g. 20 U.S.C. §§

1415(b)(4), (d)(2); 34 C.F.R. §§ 300.9(a), 300.322(e), 300.503(c), 300.504(d); 8 NYCRR

§§ 154-1.3(b), 200.1(I)(1), 200.4(a)(9)(ii), 200.4(b)(6)(xii), 200.4(g)(2)(ii), 200.5(a)(4),

200.5(d)(5), 200.5(f)(2). The purpose of those regulations, of course, is to ensure that language barriers do not prevent the parents of disabled children from understanding or consenting to their child's special education program.

Here, it is undisputed that MB is a native Spanish speaker, and that not all documents considered or issued by the CSE subcommittees were translated into Spanish. But the underlying legal standard is whether MB "had an adequate opportunity to participate in the development of [the] IEP." <u>Cerra</u>, 427 F.3d at 192. Based on its review of the administrative record, the Court concludes by a preponderance of the evidence that MB did have that opportunity. Thus, any procedural violation that the School District may have committed did not deprive RAB of a FAPE.

First, the School District has asserted that there were either bi-lingual staff or a full-fledged Spanish-language interpreter at each of the relevant CSE meetings, and that all relevant evaluations and other documents were translated as they were reviewed. The School District's assertion is supported by the record evidence, and MB does not seriously dispute that the salient information (in summary form) was verbally translated for her. (<u>See</u> Pls.' Mem. at 6 (arguing that verbal translation does not satisfy the regulatory requirement)). The SRO concluded that "the hearing record supports a finding that the parent actively participated in the CSE meetings," (SRO Dec. at 14), and this Court agrees.[10]

---

[10] Plaintiffs correctly note that the SRO improperly cited 8 NYCRR § 200.4(b)(6)(xii), which requires "the results of the evaluation are provided to the parents in their native language" (not a "[s]ummary of the results of the evaluation" as the SRO wrote). That said, the regulation does not unambiguously require that a <u>full</u> written translation of each evaluation be provided to the parent,

MB argues that with the proper written translations, she would have been able to review, understand, and "possibly seek an independent educational evaluation" prior to the relevant CSE subcommittee meetings. (Pls.' Mem. at 7-8.) Further, after each meeting, she would have been able to review the School District's recommendations and "understand why the District denied her requests." (Id. at 8.) But there is very little indication that MB did <u>not</u> understand RAB's evaluations, the CSE subcommittee proceedings, or the School District's reasoning. In fact, the record supports the opposite conclusion. The IEP meeting notes make clear that MB repeatedly voiced her concerns and objected to the subcommittee's recommendations when appropriate. Additionally, MB <u>did</u> in fact seek independent evaluations, and in multiple instances requested new evaluations and/or program review meetings from the School District. Put simply, despite any technical violation of federal or state regulation regarding translation/interpretation, it is clear that MB was an active and meaningful participant in all of the meetings at issue in this case. Accordingly, there is no basis for this Court to conclude that such violations, if they did in fact occur, deprived RAB of a FAPE.

2.  Evaluations

Under the IDEA, a local agency must ensure that each child is "assessed in all areas of suspected disability," 20 U.S.C. § 1414(b)(3)(B), including "health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities," 30 C.F.R. § 300.304(c)(4).

---

and even if it did that would not affect the Court's conclusion that MB actively participated in the relevant CSE subcommittee meetings.

Furthermore, those evaluations must be "sufficiently comprehensive to identify all of the student's special education needs, whether or not commonly linked to the disability category in which the student has been identified." 8 NYCRR § 200.4(b)(6)(ix); see also 30 C.F.R. § 300.304(c)(6). Here, plaintiffs argue that the School District deprived RAB of a FAPE when it failed to specifically evaluate him for autism and assistive technology needs.[11] (Pls.' Mem. at 8-10.) In support of that argument, plaintiffs argue that if those evaluations were properly performed, "the CSE may have made substantial changes to his IEP." (Id. at 9 (emphasis added).)

On this issue, the Court agrees fully with the SRO's thorough and well-reasoned conclusion that each CSE subcommittee had and considered sufficient evaluative information to develop an appropriate IEP for RAB. (See SRO Dec. at 14-21, 31-32, 38-42.) Of particular note, the Court agrees with the SRO's conclusion (reversing the IHO) that the School District was not required to specifically evaluate RAB for autism after receiving MB's private CERC evaluation results in May 2015. (Id. at 39 ("[R]eview of the hearing record shows that the June 2015 CSE subcommittee had information about the student's skills and needs that was generally consistent with the results of the [CERC evaluations].")

The record demonstrates that from February to May 2013, the School District performed the following reports/evaluations on RAB: (1) an occupational therapy

---

[11] Plaintiffs briefed this issue as an alleged procedural violation. And it is true that failure to properly evaluate a disabled student constitutes a procedural violation of the IDEA. That said, there is clear overlap between the procedural aspect of this issue and the central question of whether the disputed IEPs were substantively inadequate as a result. The discussion here is limited to whether defendant properly evaluated RAB prior to developing the disputed IEPs. For the reasons stated infra, the Court separately concludes that all of the disputed IEPs were substantively adequate.

annual report; (2) a physical therapy annual report; (3) an educational evaluation (including an Assessment of Basic Language and Learning Skills ("ABLLS-R")); (4) a psychological re-evaluation; (5) a bilingual speech-language evaluation; (6) a social history update; (7) a medical evaluation; and (8) a home-based ABA progress report. The results of those reports/evaluations were reviewed and discussed at the 2013-14 IEP Meeting, and were used by the CSE subcommittee to "thoroughly identif[y] the student's skills and needs in cognitive, academic, communication, motor, and social/behavioral domains." (SRO Dec. at 19.) Although RAB was not specifically evaluated for autism or assistive technology, the CSE subcommittee had enough information regarding RAB's social and emotional condition to develop an IEP that addressed his individual needs. In other words, the performed evaluations were "sufficiently comprehensive to identify all of the student's special education needs," even if they weren't sufficient to identify the underlying causes. 8 NYCRR § 200.4(b)(6)(ix).

Prior to the 2014-15 IEP Meeting, the School District conducted additional evaluations on RAB, including: (1) a new occupational therapy report; (2) a new physical therapy report; (3) a new bilingual speech-language review; and (4) a new educational evaluation. Further, from January-April 2015, the School District completed a series of re-evaluations in response to MB's concerns, including: (1) a new educational evaluation; (2) a speech-language update; (3) a new occupational therapy review; and (4) a new safety evaluation. Far from abandoning its

procedural obligations under the IDEA, the record demonstrates that the School District was continually evaluating RAB in all required areas.

Even if the Court were to conclude that the School District erred in not specifically evaluating RAB for autism and/or assistive technology, it would still not conclude that error resulted in a denial of a FAPE or deprived him of any educational benefit. See 20 U.S.C. § 1415(f)(3)(ii). As the SRO correctly noted, each CSE subcommittee possessed and considered evaluative information that was generally consistent with the results of MB's private CERC evaluations. In many ways, the School District's chosen evaluations were more comprehensive and collected more information regarding RAB's special education needs than the evaluations MB now argues should have been performed. Put simply, there has been no showing that an autism-specific evaluation (or formal autism diagnosis) would have changed RAB's recommended suite of special education services in any respect. Accordingly, there is no basis to conclude that any procedural violations that may have occurred resulted in denial of a FAPE.

3. Other Alleged Procedural Violations

In their memorandum, plaintiffs briefly identify three "other procedural violations": (1) failure to recommend parent counseling; (2) failure to issue a PWN; and (3) failure to maintain adequate trial data. (Pls.' Mem. at 11-12.) Based on its review of the record, the Court concludes by a preponderance of the evidence that none of these alleged procedural violations provide a basis for relief under the IDEA.

Although plaintiffs correctly note that New York law requires provision of parent counseling and training for all students with autism, see 8 NYCRR §§ 200.13(d), RAB was never formally diagnosed with autism. Of course, plaintiffs have argued that the lack of a formal autism diagnosis was a separate procedural violation. (See Pls.' Mem. at 8-10.) But given that the Court has already concluded defendant's evaluations were legally sufficient, it will not now conclude defendant erred in not recommending parent counseling. As previously noted, the relevant legal question is whether any particular procedural violation (or combination of violations) impeded the student's right to a FAPE or deprived him of any educational benefit. See 20 U.S.C. § 1415(f)(3)(ii). And with regards to this specific issue, the Second Circuit has repeatedly held that "failure to provide counseling ordinarily does not result in a FAPE denial." M.W., 725 F.3d at 142. Here, there has been no showing that the School District's failure to recommend parent counseling deprived RAB of a FAPE.

The Court has considered plaintiffs' remaining arguments regarding defendant's alleged failure to issue a PWN and failure to maintain discrete trial data regarding RAB's performance and finds them to be without merit. The Court concludes that neither alleged procedural violation, even accepted as true, is sufficiently serious so as to constitute the denial of a FAPE under the applicable legal standards.

B.     Substantive Adequacy

Plaintiffs' substantive arguments are broken into two groups: (1) the alleged

substantive inadequacy of the IEPs themselves (Pls.' Mem. at 16-23); and

(2) defendant's alleged failure to properly implement the disputed IEPs (id. at 12-

16).  Each group is addressed in turn.

1.     Substantive Adequacy of the IEPs

In many ways, the crux of this case is the actual substantive adequacy of the

2013-14, 2014-15, and 2015-16 IEPs.  As previously explained, the IDEA requires

that each disabled student receive a FAPE "that emphasizes special education and

related services designed to meet their unique needs and prepare them for further

education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A).  A

FAPE must include "special education and related services tailored to meet the

unique needs of a particular child" and must be "reasonably calculated to enable the

child to receive educational benefits."  Gagliardo, 489 F.3d at 107 (internal

quotation omitted); see also Endrew F., 137 S. Ct. at 1000-01 (holding that an

educational program must provide for more than just de minimis progress from year

to year).  In order to provide a FAPE, the applicable local agency must develop an

IEP that is "likely to produce progress, not regression," and "afford[] the student

with an opportunity greater than mere trivial advancement."  T.P., 554 F.3d at 254

(internal quotation omitted).

Plaintiffs allege that for each of the years at issue (that is, 2013-14, 2014-15,

and 2015-16), the School District failed to develop an IEP that was "reasonably

calculated to enable progress appropriate to the student's circumstances," and therefore failed to provide RAB the requisite FAPE. (See Pls.' Mem. at 16-24.) In support of that broad allegation, plaintiffs have raised a number of discrete arguments, some of which span all three years and others that are specific to one or two. Those arguments include defendant's: (1) failure to include "new, appropriate, and measureable goals" in the relevant IEPs (id. at 17-18); (2) failure to recommend or provide a dedicated 1:1 aide (id. at 18-19); (3) decision to recommend a 12:1+1 class rather than 8:1+1 or some smaller number (id. at 20); (4) decision to remove "ABA" from the program description of RAB's recommended placement (and, by implication, defendant's subsequent failure to provide ABA instruction) (id. at 20-21); (5) failure to provide adequate speech and language therapy (id. at 21); (6) failure to ensure meaningful progress (id. at 21-22); and (7) failure to substantially alter RAB's recommended services after receiving results of MB's private CERC evaluation (id. at 22-24).

All of the above-mentioned arguments were presented to, considered, and ultimately rejected by the SRO, who concluded that each CSE subcommittee appropriately identified and considered RAB's special educational needs, and that each IEP correspondingly provided a program likely to deliver a meaningful educational benefit.[12] (See generally SRO Dec. at 14-46.) Having conducted an

---

[12] Plaintiffs correctly note that at the time of the SRO decision, the Supreme Court had not yet issued its opinion in Endrew F., which held that an IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances," and that it must offer more than mere de minimis progress from year to year. See 137 S. Ct at 999-1001. That said, the Supreme Court's decision in Endrew F. merely clarified the pre-existing legal standard announced in Rowley (which the SRO appropriately considered), and this Court does not read the SRO's decision as improperly suggesting that the IEPs at issue contemplate or provide for de minimis progress.

independent review of the administrative record, this Court reaches the same conclusions for substantially the same reasons identified by the SRO. In doing so, the Court is not "simply rubber stamp[ing]" the SRO's decision, but rather giving "due weight" to a particularly thorough and well-considered decision made by an administrative officer with "the specialized knowledge and experience necessary" to resolve the kinds of questions presented herein. See Walczack, 142 F.3d at 129 (quoting Rowley, 458 U.S. at 206). Below, the Court provides individualized analysis regarding some, but not all, of plaintiffs' substantive arguments.

First, with regards to annual goals and short-term objectives, is it true that there is some carry-over between the years at issue. But that, standing alone, does not mean the identified goals and objectives per se failed to provide or deliver a meaningful educational benefit. As the SRO correctly pointed out, the goals and objectives were not completely identical—each of the disputed IEPs contained a number of new goals and objectives that appropriately reflected RAB's progress and updated evaluative information. And to the extent certain goals and objectives were repeated, the record does not suggest that such repetition was the result of laziness or incompetence on the part of the relevant CSE subcommittee. On the contrary, the record demonstrates that the School District was actively and estimably engaged in continuously evaluating and analyzing RAB's special education needs and designing goals and objectives calculated to enable RAB to make appropriate progress.

Second, the Court concludes by a preponderance of the evidence that RAB's recommended placement in a 12:1+1 "special life skills" class did not deprive him of a FAPE for any of the three years at issue. The administrative record is replete with evidence tending to suggest that the 12:1+1 class was the most appropriate placement for RAB in light of his social and academic needs.[13] Plaintiffs argue in an entirely conclusory fashion that RAB should have been placed in a smaller class, for instance an 8:1+1 class. (See Pls.' Mem. at 20 ("R.A.B. required an appropriate peer group in a smaller, no larger than eight-student class.") But plaintiffs do not even attempt to explain precisely why an eight-student class would be preferable, let alone necessary for a FAPE. Given the considerable evidence relied on by the relevant CSE subcommittees and the corresponding lack of evidence to support plaintiffs' preferred placement, this Court will not overturn the School District's decision to recommend a 12:1+1 class or the SRO's conclusion that such recommendation was substantively adequate. See Cerra, 427 F.3d at 191 ("[I]t is critical to recall that IDEA's statutory scheme requires substantial deference to state administrative bodies on matters of educational policy."); see also Walczak, 142 F.3d at 129 ("The responsibility for determining whether a challenged IEP will provide a child with [a FAPE] rests in the first instance with administrative hearing and review officers.").

_____

[13] In particular, the School District was of the opinion that RAB would benefit from social interaction with other students enrolled in the 12:1+1 class, and that the data-driven methodology utilized in that class was appropriate to address RAB's academic needs.

Similarly, there is no basis to disturb the SRO's conclusion that the School District was not required to provide RAB with a dedicated 1:1 aide. Each CSE subcommittee at issue had detailed information regarding RAB's medical, academic, and safety needs. And each CSE subcommittee concluded that a dedicated 1:1 aide was unnecessary, instead choosing to recommend substantial shared aide services (increasing from two hours per day in 2013-14 to "as needed" during the school day in 2014-15 to "throughout the day" in 2015-16).

It is quite clear, both from the administrative record and plaintiffs' arguments before this Court, that MB would prefer RAB to have a dedicated 1:1 aide. But plaintiffs have failed to demonstrate how or why a dedicated 1:1 aide was necessary as a matter of law. The preponderance of the evidence in the administrative record demonstrates that RAB was supervised by an adult at all times, and that RAB received considerable individualized attention for redirection and refocusing. MB's preference for a dedicated 1:1 aide is understandable, but the IDEA guarantees "an appropriate education, not one that provides everything that might be thought desirable by loving parents." Walczak, 142 F.3d at 132. The Court concludes that lack of a dedicated 1:1 aide did not deprive RAB of a FAPE for any of the years at issue.

The Court has considered the rest of plaintiffs' substantive arguments and finds them to be without merit. It is clear from the administrative record that each year, the School District carefully reviewed and considered the appropriate evaluative information and developed an individualized program designed to deliver

RAB the requisite educational benefit. Ultimately, "the role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed." Gagliardo, 489 F.3d at 112 (internal quotation omitted). Having independently reviewed the record in this case, the Court concludes by a preponderance of the evidence that the School District fulfilled its obligations under the IDEA.

### 2. Failure to Implement

In order to provide a FAPE, a local agency must actually implement the student's IEP by providing the recommended special education and related services. See 20 U.S.C. § 1401(9)(D); 34 C.F.R. §§ 300.17(d), 300.323(c). If a local agency fails to implement an IEP in a substantial or "material" respect, such failure constitutes the effective denial of a FAPE. See A.P. v. Woodstock Bd. Of Educ., 370 F. App'x 202, 205 (2d Cir. 2010). Here, separate from the actual substantive adequacy of the IEPs, plaintiffs argue that the School District failed to properly implement the IEPs in a way that violated the IDEA. (See Pls.' Mem. at 12-16.) In support of that argument, plaintiffs point to three specific examples, each of which is addressed in turn.

First, plaintiffs argue that the School District failed to provide adequate ABA instruction as called for in the 2013-14 IEP. (Id. at 12-15.) It is true that the 2013-14 IEP recommended that RAB be enrolled in "Special Class (ABA Classes)" with a 12:1+1 staffing ratio. (See Ex. P-B at 18.) But besides that parenthetical descriptor in the class title (which defendant has proffered is clerical), the 2013-14 IEP does not indicate that the CSE subcommittee intended to recommend that RAB must

receive exclusively ABA instruction.  Instead, the 2013-14 IEP recommends that RAB be enrolled in the exact 12:1+1 life skills class that he was ultimately enrolled in.  What's more, the administrative record demonstrates by a preponderance of the evidence that RAB's 12:1+1 life skills class did utilize data-driven instruction consistent with ABA methodology.  Accordingly, the Court easily concludes that the School District did not fail to implement the 2013-14 IEP in any substantial or material respect, and did not deny RAB a FAPE.

Second, plaintiffs argue that the School District failed to provide door-to-door transportation in accordance with the 2013-14, 2014-15, and 2015-16 IEPs, and that RAB is entitled to "an equitable compensatory remedy" as a result. (Pls.' Mem. at 15.)  As an initial matter, it is undisputed that (1) all three IEPs at issue recommended door-to-door transportation, (2) the School District did not actually provide door-to-door transportation until October 2015, and that (3) prior to that date, RAB was required to walk a short distance from his house to reach the provided transportation.  That said, the Court concludes that this failure was not so substantial or material as to constitute the denial of a FAPE, and that RAB is not entitled to a windfall remedy of compensatory education as a result.  Plaintiff has not argued (and the administrative record does not demonstrate by a preponderance of the evidence) that RAB missed any instructional time or suffered any injury as a result of the School District's failure.  Accordingly, there is no equitable basis to award compensatory education, which was not requested in the IHO or SRO proceedings.

Finally, plaintiffs argue that the School District failed to provide the assistive technology services recommended by the 2014-15 IEP. (Id. at 15-16.) Specifically, plaintiffs allege that the School District did not provide RAB with an individualized iPad to take home until March 2015. (Id.) The 2014-15 IEP recommended that RAB be given an iPad "[t]hroughout the School Day," both at "[s]chool and home," to assist with "written communication and assignments due to undeveloped grapho-motor control." (Ex. P-C at 12.) The administrative record demonstrates that RAB was given an iPad to use at school at the beginning of the 2014-15 school year, but that he was not given an iPad to take home until later in the year. The Court concludes, as did the SRO, that this constitutes a minor failure to implement. However, given that RAB received assistive technology in the form of an iPad "[t]hroughout the School Day," and that he eventually did receive an iPad for home use, the Court concludes that the School District did not fail to implement the 2014-15 IEP in a way that deprived RAB of a FAPE.

To the extent plaintiffs' brief can be construed to include other failure to implement claims (e.g., that the School District's failure to adequately provide for RAB's safety), the Court finds them to be without merit. Having independently reviewed the administrative record, the Court concludes by a preponderance of the evidence that the School District did not fail to implement any portion of the 2013-14, 2014-15, or 2015-16 IEPs in a way that deprived RAB of a FAPE.

IV.   CONCLUSION

For the reasons stated above, plaintiffs' motion for summary judgment at

ECF No. 11 is DENIED.

The Clerk of Court is directed to terminate this action.

SO ORDERED.

Dated:        New York, New York
              March 29, 2018

_____
            KATHERINE B. FORREST
            United States District Judge